### EMMA J. CRANWELL

*v.*

### CLINTON REALTY COMPANY AND AUGUST KLEINKE.

[Filed October 12th, 1904.]

1. Time is not of the essence of an agreement to convey lands unless the parties have expressly so stipulated, or it follows by necessary implication from the nature of the transaction.

2. The vendor cannot rescind an agreement to convey lands because of the default of the vendee unless he first tenders to the vendee a proper deed and demands payment, which is refused.

3. A person purchasing land, with notice of an enforceable contract by his vendor to sell to another, may be compelled to specifically perform.

4. The vendee in a contract for the sale of lands secured various extensions of time and finally failed to pay certain interest and taxes, which he had promised to pay, to secure the last extension, but he at all times expressed his desire to take the property.—*Held*, that he was entitled to a decree for specific performance, but that he was not entitled to costs, because of his delay.

5. *Quære.* Can a vendor make time of the essence of a contract to convey lands by giving a notice requiring the vendee to make settlement within a time specified therein?

---

On bill, answer, replication and proofs.

*Messrs. Weller & Lichtenstein,* for the complainant.

*Mr. Frederick N. Eberhard,* for the Clinton Realty Company.

*Mr. Augustus A. Rich,* for August Kleinke.

GARRISON, V. C.

This is a bill filed by Emma J. Cranwell against the Clinton Realty Company and August Kleinke, praying for the specific performance of a contract to convey real estate.

On the 19th day of April, 1902, the Clinton Realty Company, through its general manager, George J. Luxton, entered into a written contract with George W. Cranwell, agreeing to sell to him certain lots in the town of West Hoboken, in Hudson county, in this state, for the sum of $3,000, to be paid $150 at the signing of the agreement, "and the remaining $2,850 on or before the 19th day of October, in the year 1902, at the company's office."

The company agreed, "on receiving such payments at the time and in the manner above provided * * * to deliver to the said Cranwell a proper deed," &c.

On the 28th of August, 1902, there is written upon the original agreement an assignment of all the right, title and interest of George W. Cranwell to Emma J. Cranwell.

On the 14th day of October, 1902, there is written upon the agreement the following:

"JERSEY CITY, N. J., Oct. 14th, 1902.

"For the further consideration to extend this contract, the party of the second part(y) agrees with the party of the first part to pay taxes confirmed in 1902, for 1903, and interest of five per cent., from Oct. 19th, 1902.

"The within contract is extended six months from Oct. 19th, 1902.

"CLINTON REALTY CO.,

"G. J. LUXTON, *Gen. Mgr.*"

After the execution of the agreement Cranwell entered into possession of the lots by building a fence and by depositing contractor's materials upon the land.

While the rights of Cranwell appear to have been assigned to his daughter, it is quite clear from the testimony that this was merely a formal assignment, and that all of the equitable rights were vested in George W. Cranwell, the signer of the agreement.

From the expiration of the written extension, which occurred on the 19th of April, 1903, down to the 1st of November, 1903, it is quite clear that the failure of Cranwell to make the pay-

ment required by the contract was acquiesced in by the realty company.

He was waiting to receive some moneys due him for work upon buildings that he had contracted to finish, and had communicated this fact to Mr. Luxton, and the company was willing to wait upon him, and did so.

On the 1st of November, 1903, Mr. Wright, the president of the realty company, went to see Mr. Cranwell and called to his attention the fact that he had not paid the interest and the taxes, and wanted to know when he would settle up.

Cranwell informed him of various misfortunes which had overtaken him, and requested more time, and Wright informed him that he could not do anything about that until he had had a consultation with Mr. Butts, who, it appears, was largely interested in the realty company, and was its secretary and treasurer.

In this conversation with Wright, Cranwell referred to a debt of $280 owing to him by Mr. Luxton, for work done by Cranwell for Luxton on Luxton's property.

I think it clearly appears from the evidence that although there was no agreement between Luxton and Cranwell, and certainly none between the company and Cranwell, that this $280 should be credited to Cranwell on the purchase of the lots, still both Cranwell and Luxton intended that Cranwell should receive the benefit of this credit in the final settlement.

I refer to this matter because I think it casts light upon Luxton's failure, acting for the company, to press Cranwell with respect to the payment of the taxes and interest, and Cranwell's failure to raise and pay that amount from other sources.

When Mr. Cranwell mentioned the matter of this credit to Mr. Wright the latter immediately informed him that it could not be allowed, and it is not claimed in this case that it should be.

On the 6th of November, 1903, Messrs. Wright and Butts called upon Mr. Cranwell.

Cranwell made the same statement to them concerning his financial condition as he had previously made to Mr. Wright. He was very desirous of obtaining more time, and they were

willing to give it to him, but wanted the matter of taxes and interest settled.

They gave him at that time a computation of the amount of interest and of the taxes, $215.15, and they say that he said it was an easy matter for him to pay that, and that he would send them a check the next day.

They gave him the address of Mr. Butts, to whom he was to send the check.

I do not find that upon that day there was any agreement that if he did not send the check the next day the company would cancel the contract. I do think that it was the general understanding that he was to send a check the next day or within a day or so.

The witnesses for the complainant testify that on the 10th day of November, a check was made out to the realty company for $142.50, the amount of the interest due, and was mailed to the realty company, in care of Mr. Butts, at the address given to Mr. Cranwell by Mr. Butts.

They explained that the check was only made for the amount of the interest, because they hoped to obtain a reduction of the taxes.

They produced a check book which bears the appearance of having been in every-day use, and on the seventh stub of which there appears a memorandum of a check made out to the Clinton Realty Company, for the sum of $142.50, under date of November 10th, 1903.

There is nothing in the appearance of the book—which seems to have been used continuously before and since that date—to cast any suspicion on the truth of this testimony.

The son, James W. Cranwell, testifies that he personally wrote the words upon the check and the stub; that the check was signed by his sister, the complainant, in whose name the account stood, and that he placed it in an envelope with a return address printed on the outside, and stamped and addressed the envelope as above stated, and gave the same to his father to mail.

The father testifies that he mailed it.

All of the witnesses for the complainant testify that neither the check nor the envelope were ever seen by them again.

The witnesses for the defendant testify that the check was never received by them.

The testimony of the complainant with respect to the sending of this check is corroborated by the testimony of George J. Luxton, who was general manager of the realty company and a witness produced by it.

On the 11th day of November, 1903, Messrs. Wright and Butts composed and sent a letter, as follows:

"HOBOKEN, N. J., Nov. 11th, 1903.

"*Mr: G. W. Cranwell, or whom it may concern:*

"You are hereby notified if payment is not made according to our oral arrangement this week, the company will cancel your contract and all right to same.

"CLINTON REALTY CO.,

"THEO. BUTTS, *Sec. & Treas.*"

On that day Mr. Luxton met the younger Cranwell and told him that he had just come from the office of the company and that they had sent a stern letter to his father, because he had not paid the interest and taxes, to which the younger Cranwell replied that they had sent a check, and Luxton thereupon said that if that was so they need pay no attention to the letter.

Either that day or shortly after, Mr. Luxton was taken by one of the Cranwells to their house and was there shown the check book and saw the stub of the check.

I therefore find that a check was made out and sent for the sum of $142.50, which was the interest then due.

Since the check was not received it is not evidence of payment, but is important as showing the intention of the vendee.

About ten days after this a rumor reached the Cranwells that the company had sold these lots to some one else.

The elder Cranwell, who learned this apparently on the 21st of November, 1903, which was Saturday, went to see Mr. Luxton on Sunday, and was referred by him to Mr. Wright, whom he went to see on Monday, the 23d of November.

When he reached the office of Mr. Wright on that day Mr. Kleinke, the defendant, was there.

Mr. Cranwell testifies that he told Mr. Wright he was prepared to take the title then. Mr. Wright testifies that Cranwell said he was ready to take the title on the 1st of December.

A contract to convey these same lots to Kleinke for the sum of $3,215 had then been written, but had not been signed by Kleinke.

Mr. Wright informed Mr. Cranwell that he was too late, as he had already sold the lots to Mr. Kleinke. Cranwell threatened to obtain an injunction, and left the office, and Kleinke subsequently signed the contract, and a deed was immediately prepared from the realty company to Kleinke, and was signed and recorded the next day, November 24th.

Kleinke had, previous to this day, full notice of the agreement between the realty company and Cranwell.

The consideration to Kleinke is $3,215, which is the total of the original consideration of $3,000 plus the $215 of interest and taxes, so that the sale to Kleinke realized to the realty company exactly the same sum of money as the sale to Cranwell would have realized.

Under the contract with Kleinke the company was to receive $200 in cash on the execution of the agreement, $915 on the delivery of the deed, and a bond and mortgage for $2,100.

They did receive the $200 in cash, but took a note for the $915, because, as Mr. Wright explains, they thought there would be a law suit and they wanted to hold the note to abide the issue.

Mr. Wright evidently means, by this testimony, that they did not desire to take cash from Mr. Kleinke, since he might have to reconvey to Cranwell, and 'they did not desire to keep him out of his money if he was not to get the land.

The bill in this case was filed on the 28th of November, 1903, immediately after the conveyance to Kleinke.

Since I find, as a fact, that the delay in payment of the balance of the purchase-money, down to the 1st day of November, 1903, was acquiesced in by the realty company, it is only neces-

sary to consider the effect of the conduct of the parties from then
to November 23d.

It is well settled, in this state, that time is not of the essence
of an agreement to convey lands unless the parties have ex-
pressly so stipulated, or it follows by necessary implication from
the nature of the transaction. *Cramer* v. *Mooney, 59 N. J. Eq.
(14 Dick.) 164* (at *p. 170*) (*Vice-Chancellor Grey, 1899*), citing
cases; *Bullock* v. *Adams' Executors, 20 N. J. Eq. (5 C. E. Gr.)
367* (at *p. 371*) (*Chancellor Zabriskie, 1869*), citing cases.

A court of equity considers that the vendee is the equitable
owner of the land, and the vendor is entitled to the purchase-
money, and that unless, either by express terms or necessary
implication, time becomes of the essence of the contract, equity
is done by securing the legal title to the land to the vendee
and possession of the purchase-money, with interest, to the
vendor, within a reasonable time.

The court will not countenance unreasonable delay, nor will
it aid a vendee to obtain an unfair advantage by being passive
if the value of the property is lessening or stable and quickening
into activity, only when the value of the property has risen.

But if none of these elements are present—and none are pres-
ent in the case now under consideration—the court merely looks
to see whether the delay in the payment of the purchase-money
has been unreasonable.

If the vendee has not shown any disposition to abandon his
contract, but, on the other hand, has shown that he is endeavoring
to carry it out, the court will hold that a short delay is not
unreasonable.

The fact that the vendee has gone into possession and has
expended money upon the property, is an added reason for
decreeing a specific performance of the contract to convey to
him, and the further fact that the part of the purchase price
paid by him at the time of the execution of the contract was
never returned or tendered to him, is an additional equity in
his favor.

It would also appear that the vendor cannot successfully con-
tend that he rescinded the contract because of the default of the

vendee, unless he shows that he tendered to the vendee a proper deed and demanded payment, which was refused. *Flandrau* v. *Albanesius, 63 N. J. Eq. (18 Dick.) 800 (Court of Errors and Appeals, 1902)*; *Leaird* v. *Smith, 44 N. Y. 622.*

There is no evidence in this case that the realty company ever tendered a deed to the vendee.

The real question that I find necessary to determine in this case is whether the defendant, the realty company, by reason of the arrangement alleged to have been made on November 6th, 1903, or by reason of the notice given to Cranwell, dated November 11th, 1903, acquired the right to rescind or terminate the original contract on account of default by Cranwell.

As I have stated before, I do not find that at the conversation between Wright, Butts and Cranwell, held on November 6th, any agreement was arrived at by which the company could terminate the contract at once, if Cranwell did not pay the taxes and interest.

The subject under discussion at that interview was the length of extension that the company would give Cranwell. He wanted many months, and they would not accede to his desire.

They finally agreed that if he would pay the taxes and interest they would extend the time until the 1st day of February, 1904.

The circumstances concerning the sending of the check, in pursuance of this arrangement, have been heretofore detailed.

With respect to the notice dated November 11th, 1903, it should first be observed that they do not therein demand that he pay the balance due upon the purchase price or suffer a loss of his contract, but demand that he shall pay the taxes and interest within the week or they will cancel the contract.

Whatever effect in equity might be given to a notice from the vendor to the vendee that he must settle within a specified time or lose his right under the contract, in the case at bar there are mitigating circumstances in favor of the vendee.

It will be recalled that the testimony shows that a check for the interest was sent on November 10th, and that the notice was dated November 11th. On the last-mentioned day, and before that notice was received by Cranwell, Cranwell's son met Luxton

and was informed by him that such a notice was on the way, and when the younger Cranwell told Luxton that they had sent the check, Luxton replied that then they need not pay any attention to the notice.

For the purpose of avoiding responsibility for the conduct of Luxton as binding on the company, they sought to show that Mr. Luxton's connection with the company and his right to represent it ceased at a period prior to the latest negotiations with Cranwell.

While there is no clear exposition given by the witnesses for the defendant, the realty company, of its internal arrangements, I think it sufficiently appears that the following was the situation: Wright, who was president, Butts, who was secretary and treasurer, and Luxton, who was general manager, were in a close corporation dealing in real estate. Butts had evidently advanced some $6,000 to the enterprise, and it was the understanding that he was to receive this sum back before the others obtained any dividend, or, as they expressed it, "had any interest."

As among themselves, Luxton, as general manager, at first seems to have had undisputed power to bind the corporation in every legitimate way. They intimate, rather than prove, that later he was shorn of some of his powers, and under very suggestive and leading questions put to Mr. Wright by counsel for the company, they sought to prove that they brought notice of this home to Cranwell.

But I think they failed to prove that Cranwell was ever properly informed that Luxton could no longer speak for the company.

Long after the time they claim that Luxton had ceased to have the right to bind the company, we find, from the testimony, that his apparent relationship toward it remained as before. We find, for instance, that he is constantly sent by the others to Cranwell; we find him selling property as before; the testimony shows that he was present, with the others, when the communication of November 11th was determined upon and was written and sent, and the very contract to Kleinke, which

was drawn upon the day that the realty company claims it rescinded the contract with Cranwell, was written by Luxton.

Luxton himself testified that he has now the same interest that he always had.

Under these circumstances, I find that Cranwell, who had had all his dealings with Luxton, was justified in continuing to believe that Luxton was vested with the same power that he had always theretofore had to bind the company.

Whether or not a vendor may, so to speak, make time of the essence of a contract by giving a notice requiring the vendee to make settlement within a time specified therein seems to be debatable. *Hubbell* v. *Von Schoening, 49 N. Y. 327.*

But even conceding that such a notice might be effectual, the vendor could only claim default after he had shown full performance upon his part and that he tendered a proper deed to the vendee. *Hubbell* v. *Von Schoening, supra.*

I think that the rule formulated by the court or errors and appeals in the case of *McTague* v. *Sea Isle City Building Association, 57 N. J. Law (28 Vr.) 428,* applies to the case at bar. In that case the court said: "An executory contract that contains no stipulation for its rescission and that has not been induced by fraud, may, in general, be rescinded by one party only when the other expressly refuses to perform, or has rendered himself incapable of performing it, or has otherwise evinced his abandonment of it. Mere delay in the execution of a contract whose terms would be satisfied by performance within a reasonable time does not of itself entitle the other party to rescind."

I find that from the time of the interview on November 1st, 1903, to November 23d, 1903, the vendee showed his evident intention to take the property and pay for it, and showed clearly that he did not desire to abandon the contract, and that it was reasonable for him, in view of the conversations that he had had with the different officers of the company, to believe that they would wait for him to obtain the money that he had explained to them he expected to get, and that when he visited the president of the company, Mr. Wright, after he had heard rumors of the sale to another, and informed Mr. Wright (taking

Mr. Wright's version) that he would take the deed, and pay the money due on the 1st of December, which was seven days from the date of the interview, it was reasonable for the realty company to wait for that period of time before canceling the contract, or to tender him a deed and demand performance.

It is admitted by counsel for Kleinke, and clearly appears by the testimony, that Kleinke had full knowledge at the time of taking the contract and deed of the agreement between the company and Cranwell, and there is, therefore, no difficulty with respect to the decree as to his rights.

"The rule is well established that a purchaser with notice of a prior equity, superior to the rights of his grantor, takes the place of the grantor, and is bound to do that which he was bound in equity to do. Such a purchaser can be compelled specifically to perform the agreement by conveying the land in the same manner and to the same extent as the grantor would have been compelled to do had he retained the legal title. *Young* v. *Young, 45 N. J. Eq. (18 Stew.) 40, 41 (Chancellor McGill, 1889)* ; *Haughwout* v. *Murphy, 22 N. J. Eq. (7 C. E. Gr.) 547 (Justice Depue, Court of Errors and Appeals, 1871)." Brinton* v. *Scull, 55 N. J. Eq. (10 Dick.) 747 (Vice-Chancellor Grey, 1897.)*

"And to be a *bona fide* purchaser without notice, the defendant must not only have agreed to purchase without notice of the complainant's previous agreement, but he must also have actually paid the purchase-money and taken his deed without such notice." *Dean* v. *Anderson, 34 N. J. Eq. (7 Stew.) 503 (Chancellor Bloomfield, about 1810)* ; *Brinton* v. *Scull, supra.*

I will therefore advise a decree that the contract between the realty company and Cranwell be specifically performed, and that Kleinke be decreed to convey the title now vested in him.

I have determined to exercise the discretion vested in the court by the statute (*P. L. of 1902 p. 538 § 84*), by not allowing costs in this case.

My reasons for not allowing costs to the complainant are briefly these :

The complainant caused a long delay in the payment of the

purchase-money and undoubtedly often disappointed the expectations of the company with respect to the time it would receive the money, and finally, when a determined effort was made by the company to get in hand at once the interest and taxes, he did not see to it that they got the money, although, as I have found, he showed his intention to keep the contract alive by mailing the check which was not received.

The officers of the company undoubtedly believed that they were again to be disappointed with respect to receiving the money, and thought that they had a right to terminate the contract.

Their testimony was frank and full, and was given without any equivocation or attempt to either color or conceal facts.

Their good faith is further shown by the fact that the sale to Kleinke was for exactly the same sum they would have received from Cranwell, so that it is clear that they did not seek to rescind the Cranwell contract because the property had appreciated in value.

Under such circumstances, therefore, it seems to me that it would be inequitable to require the defendants to do more than carry out the contract; they should not be visited with costs.

A precedent in point in this respect is *Sharp* v. *Trimmer, 24 N. J. Eq. (9 C. E. Gr.) 422* (at *p. 426*) (*Vice-Chancellor Dodd, 1874*).

I will advise a decree in accordance with these conclusions. The form of the decree will be settled upon notice.